Miller, Presiding Judge.
Following a jury trial, Tamara Nicole Weaver was convicted of two counts of second degree cruelty to children, three counts of aggravated assault, two counts of first degree cruelty to children, and three counts of aggravated battery. The trial court imposed a 60-year prison sentence with the first 30 years to be served in prison.[1] Weaver appeals from the denial of her motion for new trial. On appeal, Weaver argues that (1) the evidence was insufficient to support her convictions for aggravated battery; (2) the circumstantial evidence presented at trial was insufficient to support all of the charged crimes; (3) the trial court erred by charging the jury with the "short version" of the pattern instructions; and (4) her trial counsel rendered ineffective assistance. For the reasons that follow, we affirm.
Viewed in the light most favorable to the verdicts,[2] the record shows that Weaver had two sons, an infant and a six-year-old. Weaver stayed home with the baby for several weeks after he was born and noticed that he cried a lot and that it was not a "normal" cry. Weaver and her children moved in with her boyfriend when the baby was less than two months old. When Weaver returned to work, she asked her mother to take care of the baby. Weaver's mother noticed that the baby cried a lot and testified that Weaver was having problems with the baby's diet and his crying. Weaver and her boyfriend both worked from 6:00 p.m. to 4:30 a.m., and after she returned to work, Weaver got very little sleep because she took care of the baby when he cried so that her boyfriend could sleep. Weaver's boyfriend only kept the baby on a few occasions. Weaver, her boyfriend, and her mother were the baby's only caregivers.
When the baby was almost three months old, the crying got worse and Weaver, her boyfriend, and her mom decided to take him to Children's Healthcare of Atlanta (Scottish Rite hospital). A child abuse pediatrician ordered x-rays of the infant and the x-rays revealed numerous bone fractures, some new and others older and in the healing process.[3] The doctor also ordered a CT scan, from which he observed additional fractures to the infant's body. The doctor testified that, in total, the infant had 16 bone fractures throughout his ribs, legs, and pelvis. The doctor testified that some type of trauma to the body would be required to break the bones and that, because the fractures were of different ages, there were at least two different traumatic events that caused the infant's injuries. For the rib fractures, the most likely explanation was a "squeezing force about the chest." The doctor opined that the leg fractures were likely caused by a yanking, jerking or flailing motion, which could not be caused by the baby himself or by normal handling of the baby. To cause the pelvic fracture, a direct trauma to the pelvis would be required, and the injury could have been caused by a person punching or stomping the baby or by a heavy fall directly onto the pelvis. Tests on the infant ruled out the possibility that genetic issues, such as brittle bone disease or other medical disorders, could have contributed to the fractures. The doctor also testified that the baby's injuries were not visible from the exterior of the body and that the types of fractures suffered by the infant would not typically leave any bruises or other marks on the outside of the body.
The doctor spoke to Weaver, who told him that she had no idea how this had happened and denied that anyone had caused any trauma *622 to her son. Weaver's mother said she was not aware of the baby experiencing any falls or being dropped or handled roughly. Weaver's boyfriend told the doctor that Weaver was not getting much sleep and that the baby's crying and fussiness were wearing her down, but he did not mention any trauma to the baby.
The doctor concluded that the injuries were most consistent with physical abuse on at least two different occasions. The doctor testified that it would only take a few seconds to inflict these types of injuries and that the number one trigger for abuse in infants from two to three months old is a crying infant. The doctor also testified that it would be highly unlikely that a six-year-old would have the ability to inflict these types of injuries.
A detective with the Griffin Police Department received a call from the hospital about the infant's multiple fractures. The detective interviewed Weaver, and that recorded interview was played for the jury. In the interview, Weaver said that she could not imagine that anyone in her family would hurt her son. The detective also interviewed Weaver's boyfriend, who said the baby cried a lot and that Weaver "dealt with him." He had no explanation as to what may have caused the baby's injuries. In an interview, Weaver's older son did not disclose that he had been abused or that he had seen anyone abuse his younger brother. The detective also interviewed Weaver's mother. At trial, the parties entered a stipulation, which was read to the jury, stating that law enforcement had ruled out Weaver's mother as a suspect. Weaver testified at trial that she did not squeeze or shake her baby in any way and had no idea that he had fractured bones. She further testified that she did not think that anything had happened to him and that the doctor may have made a mistake.
Weaver and her boyfriend were indicted on two counts of first degree cruelty to children, two counts of second degree cruelty to children, three counts of aggravated battery,[4] and three counts of aggravated assault. Weaver and her boyfriend were tried jointly, and the jury found Weaver guilty on all counts and her boyfriend not guilty on all counts. The trial court imposed a 60-year prison sentence with the first 30 years to be served in prison. Weaver filed a motion for new trial, which was denied by the trial court. This appeal followed.
1. In her first enumeration of error, Weaver argues that the evidence was insufficient to support her convictions for aggravated battery. Specifically, Weaver argues that the State failed to prove that the victim's injuries constituted "serious disfigurement" under OCGA § 16-5-24 because they were not "visible." We disagree.
In reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to support the jury's verdict and determine if a rational trier of fact could find each essential element of the crimes charged beyond a reasonable doubt. We do not weigh the evidence or determine witness credibility. Conflicts in witness testimony are matters of credibility for the jury to resolve. And as long as there is some evidence, even though contradicted, to support each fact necessary for the state's case, the verdict will be upheld.
(Citation omitted.) Clemons v. State , 265 Ga. App. 825, 825-826 (1), 595 S.E.2d 530 (2004). Also, "[b]ecause the circumstances of each aggravated battery vary, whether disfigurement is serious is best resolved by the factfinder on a case-by-case basis. Consequently, what constitutes serious disfigurement is almost always a question for the jury." Williams v. State , 248 Ga. App. 316, 318 (1), 546 S.E.2d 74 (2001).
In all interpretations of statutes, the courts shall look diligently for the intention of the General Assembly. In so doing, the ordinary signification shall be applied to all words. Where the language of a statute is plain and susceptible to only one natural and reasonable construction, courts must construe the statute accordingly. In fact, where the language of a statute is plain and unambiguous, judicial construction is not only unnecessary but forbidden.
*623 (Citation omitted.) Jackson v. State , 309 Ga. App. 24, 26 (1), 709 S.E.2d 44 (2011). Additionally, "criminal statutes must be read according to the natural and obvious import of their language, and their operation should not be limited or extended by application of subtle and forced interpretations." (Citation and punctuation omitted.) Bradford v. State , 287 Ga. App. 50, 53 (1), 651 S.E.2d 356 (2007). When a term is not defined by statute, we look to the ordinary meaning of that word, so long as it is not a word of art or a word connected with a particular trade or subject matter. See OCGA § 1-3-1 (b) (2012) ("In all interpretations of statutes, the ordinary signification shall be applied to all words, except words of art or words connected with a particular trade or subject matter ....").
The statute at issue, OCGA § 16-5-24 (a), provides that
A person commits the offense of aggravated battery when he or she maliciously causes bodily harm to another by depriving him or her of a member of his or her body, by rendering a member of his or her body useless, or by seriously disfiguring his or her body or a member thereof.
The term "seriously disfiguring" is not defined in the statute, thus we look to the ordinary meaning of the word. In an attempt to define disfigurement to support an aggravated battery conviction, this Court has previously relied on Black's Law Dictionary[5] which defines disfigurement as "[a]n impairment or injury to the appearance of a person or thing," and also defines impairment as "a condition in which a part of a person's mind or body is damaged or does not work well ...." Black's Law Dictionary (10th ed. 2014) (emphasis supplied). Webster's Dictionary defines "appearance" as an "outward aspect" or "a sense impression or aspect of a thing ...." Webster's Third New International Dictionary at 103 (1981).
In light of these definitions and pursuant to OCGA § 16-5-24 (a), Weaver's argument that the infant's injuries were not "visible" is unavailing. "Serious disfigurement" may be proven where serious damage or injury occurred to a person's body or a part of a person's body, which affected the appearance of the body or body part. Although Weaver relies upon Bray v. State , 330 Ga. App. 768, 768 S.E.2d 285 (2008), Feagin v. State , 317 Ga. App. 543, 731 S.E.2d 778 (2012), Silvers v. State , 245 Ga. App. 486, 538 S.E.2d 135 (2000), and Pollard v. State , 230 Ga. App. 159, 495 S.E.2d 629 (1998) in support of her argument, none of these decisions aid Weaver's claim. These decisions merely reflect the types of evidence this Court deemed sufficient to support aggravated battery convictions in those cases. Weaver has not cited any case by this Court or our Supreme Court that held that, to constitute serious disfigurement, the victim's injuries must be actually visible from the outside of a person's body. Nor has this Court precluded the holding that serious internal injuries, which can be visible through such means as x-ray, cannot support a conviction for aggravated battery. Notably, in Byrd v. State , 251 Ga. App. 83, 84 (1), 553 S.E.2d 380 (2001), this Court stated that "damage to internal organs of the victim ... could constitute serious disfigurement." Id. at 84 (1), 553 S.E.2d 380. Although Weaver distinguishes Byrd by arguing that the victim in that case suffered some visible injuries, Byrd 's reasoning and holding were not premised on the outward visibility of the victim's injury.
This Court also addressed the issue of internal injuries for purposes of an aggravated battery conviction in Allen v. State , 247 Ga. App. 10, 543 S.E.2d 45 (2000). There, the defendant's aggravated battery by serious disfigurement conviction was based on damage to the victim's liver and spleen. Id. at 16 (4) (b), 543 S.E.2d 45. We held that the trial court did not err in failing to instruct the jury on the lesser offense of battery because the damage to the victim's liver and spleen constituted serious disfigurement to support the defendant's aggravated battery conviction. Id. Although the issue in Allen was whether the trial court erred by failing to charge the jury on the lesser offense of battery, the reasoning of Allen applies equally here - serious injuries and documented medical damage to internal organs can be sufficient to show serious disfigurement under *624 OCGA § 16-5-24 (a). In fact, as it directly relates to the injuries suffered by the infant in this case, this Court has long held that "[w]hether fractured bones constitute serious disfigurement will depend on the specific facts of the case." (Citation omitted.) Harris v. State , 272 Ga. App. 366, 369 (2), 612 S.E.2d 557 (2005).
Here, the State presented evidence from a child abuse pediatrician who testified that, upon reviewing the infant's x-rays and CT scans, he saw 16 fractures in the infant's ribs, legs, and pelvis. He testified that, based on the level of trauma to the infant's body, at least two different traumatic events occurred. As to the rib fractures, he testified that those fractures were most likely caused by a "squeezing force about the chest." He also testified that the leg fractures were likely caused by a yanking, jerking, or flailing motion that the infant could not have caused himself. Additionally, there was testimony that, to cause the pelvic fractures, direct trauma to the pelvis would have had to occur, such as punching or stomping the infant or by a heavy fall directly onto the infant's pelvis. While the State did not introduce the x-rays or other photographic evidence to demonstrate how badly the bones were damaged, the doctor testified as to what he saw, and he indicated on a diagram as to how and where the bones were fractured. Again, "whether disfigurement is serious is best resolved by the factfinder on a case-by-case basis. Consequently, what constitutes serious disfigurement is almost always a question for the jury." Williams , supra, 248 Ga. App. at 318 (1), 546 S.E.2d 74. Thus, we conclude that this evidence was sufficient for a reasonable jury to find that there was serious "impairment or injury to the appearance of" the infant's bones, which are "members" of the infant's body. See OCGA § 16-5-24 (a). Therefore, the State met its burden of establishing serious disfigurement to support Weaver's aggravated battery convictions, and Weaver's insufficiency of the evidence claim fails.
2. Weaver contends that the evidence presented at trial that she harmed her infant son was wholly circumstantial, based solely on her custody of the child, and that it merely created a suspicion that she committed the charged crimes. She points out that both her mother and her boyfriend babysat on occasion. We disagree.
"To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6.
Not every hypothesis is reasonable, and the evidence does not have to exclude every conceivable inference or hypothesis; it need rule out only those that are reasonable. The reasonableness of an alternative hypothesis raised by a defendant is a question principally for the jury, and when the jury is authorized to find that the evidence, though circumstantial, is sufficient to exclude every reasonable hypothesis save that of the accused's guilt, this Court will not disturb that finding unless it is insupportable as a matter of law.
Debelbot v. State , 305 Ga. 534, 538 (1), 826 S.E.2d 129 (2019) ; see also Thompson v. State , 349 Ga. App. 1, 3 (1), 825 S.E.2d 413 (2019) (jury authorized to reject an alternative hypothesis it considers implausible).
The expert testified that the injuries suffered by Weaver's baby were caused by some type of trauma to the body and that they were most consistent with at least two different instances of child physical abuse. At trial, Weaver offered no alternative hypothesis for the injuries, instead stating that she had no idea how her baby was injured, or, alternatively, that nothing had happened to him and that the doctors may have made a mistake. Under the circumstances, "the jury was free not only to reject [Weaver]'s explanations of the child's injuries as unreasonable, but to find that the State's case - including testimony as to the extent and cause of the child's injuries and as to [Weaver]'s access to [him] - excluded every reasonable possibility save [Weaver]'s guilt." Hunnicutt v. State , 276 Ga. App. 547, 549 (1), 623 S.E.2d 714 (2005) ; see Thompson v. State , 262 Ga. App. 17, 18-19 (1), 585 S.E.2d 125 (2003) (evidence, although circumstantial, was sufficient to sustain the convictions for cruelty to children where doctor testified that fractures to *625 child's arms and ankle were not accidental and parents could not explain how child received injuries nor name anyone who might have caused them).
To the extent that Weaver now offers the alternative hypothesis that her mother could have injured her baby, the jury was entitled to reject that hypothesis as unreasonable because the parties entered a stipulation that law enforcement had ruled out Weaver's mother as a suspect, and that stipulation was read to the jury. And the jury specifically considered whether Weaver's boyfriend could have injured the baby when it addressed the charges against him, finding him not guilty on all counts. Whether the State's evidence excluded every reasonable possibility save that of Weaver's guilt was particularly a question for the jury, and we cannot say that the jury's verdict is unsupportable as a matter of law. See Hunnicutt , 276 Ga. App. at 549 (1), 623 S.E.2d 714 ; Thompson , 262 Ga. App. at 18-19 (1), 585 S.E.2d 125.
3. Weaver contends that the trial court erred in failing to include the language of OCGA § 24-14-6[6] in its charge on circumstantial evidence. We disagree.
Weaver failed to object to the trial court's charge on circumstantial evidence, which precludes appellate review of this portion of the jury charge, "unless such portion of the jury charge constitutes plain error which affects substantial rights of the parties." OCGA § 17-8-58 (b). To establish plain error,
[f]irst, there must be an error or defect - some sort of deviation from a legal rule - that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error-discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.
(Citation and punctuation omitted; emphasis in original) State v. Kelly , 290 Ga. 29, 33 (2) (a), 718 S.E.2d 232 (2011).
Pretermitting whether the trial court erred in failing to give a charge on circumstantial evidence that included the language of OCGA § 24-14-6, Weaver has failed to satisfy the third prong of the plain error test. "In evaluating claims of instructional error, we examine the jury charge as a whole." Gadson v. State , 303 Ga. 871, 875 (2), 815 S.E.2d 828 (2018). Viewed as a whole, the trial court's charge sufficiently informed the jury of the State's burden of excluding all other reasonable hypotheses except Weaver's guilt with respect to the crimes charged. The court gave instructions on the State's burden to prove Weaver's guilt beyond a reasonable doubt and the State's duty to prove beyond a reasonable doubt "every material allegation of the indictment and every essential element of the crimes charged." The court also advised the jury that "[f]acts and circumstances that merely place upon [Weaver] a grave suspicion of the crime charged, or that merely raise a speculation or conjecture of [Weaver's] guilt are not sufficient to authorize a conviction. ..." The court discussed the difference between direct and circumstantial evidence, and instructed the jury that it "would be authorized to convict only if the evidence, whether direct or circumstantial or both, excludes all reasonable theories of innocence and proves the guilt of the accused beyond a reasonable doubt." The instructions the trial court gave adequately advised the jury that if it believed that the circumstantial evidence supported an alternative hypothesis, it should return a verdict of not guilty, as it did with Weaver's boyfriend. See Gadson , 303 Ga. at 875 (2), 815 S.E.2d 828. Under the circumstances, we cannot say that if the trial court had added a jury instruction with the language of OCGA § 24-14-6, it is likely that the *626 jury would have returned a different verdict. Weaver has therefore failed to establish plain error. See Id. at 876 (2), 815 S.E.2d 828.
4. Weaver contends that her trial counsel was ineffective for failing to move for directed verdict on the ground that the elements of aggravated battery had not been proven and failing to object to the court's jury instruction on circumstantial evidence. This enumeration of error also fails.
To prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that the deficient performance so prejudiced the defendant that there is a reasonable likelihood that, but for counsel's errors, the outcome of the trial would have been different. If an appellant fails to meet his or her burden of proving either prong of the Strickland[7] test, the reviewing court does not have to examine the other prong. In reviewing the trial court's decision, we accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts. Furthermore, there is a strong presumption that the performance of counsel was within the wide range of reasonable professional lawyering, and we cannot reach a contrary conclusion unless defendant successfully rebuts the presumption by clear and convincing evidence. Judicial scrutiny of counsel's performance must be highly deferential.
(Citation omitted.) Bearden v. State , 316 Ga. App. 721, 725 (3), 728 S.E.2d 874 (2012).
(a) Weaver contends that her trial counsel was ineffective for failing to move for a directed verdict on the three counts of aggravated battery because the State's evidence was insufficient to support those charges. In light of our holding in Division 1, however, Weaver cannot show that trial counsel was ineffective for failing to move for directed verdict on the aggravated battery charges. See Range v. State , 289 Ga. App. 727, 731 (4), 658 S.E.2d 245 (2008) (holding that because the standard for denial of a motion for directed verdict is the same as the standard for sufficiency of the evidence, the defendant could not show that trial counsel was ineffective for failing to move for directed verdict because the evidence was sufficient to sustain the defendant's conviction).
(b) Next, Weaver contends that her trial counsel performed deficiently when he failed to object to the trial court's charge on direct and circumstantial evidence because it did not include the language of OCGA § 24-14-6. We disagree.
"When a defendant raises an ineffective assistance of counsel claim based on counsel's failure to request or object to certain jury charges, the defendant must show that the charges in question were erroneous and that, if proper charges had been given, there is a reasonable probability that the result of the trial would have been different." (Citation and punctuation omitted.) Wilhite v. State , 337 Ga. App. 324, 325 (1), 787 S.E.2d 293 (2016). "And if the defendant fails to meet h[er] burden on one prong of this two-prong test, we need not review the other prong." Id. Pretermitting whether the trial court's charge on circumstantial evidence was erroneous, Weaver cannot establish the second prong of her claim of ineffective assistance of counsel because even if the trial court had included a jury instruction with the language of OCGA § 24-14-6, as discussed in Division 3, there is not a reasonable probability that the result of the trial would have been different. See Gadson , 303 Ga. at 876 (2), 815 S.E.2d 828 ; Wilhite , 337 Ga. App. at 326-327 (1) (b), 787 S.E.2d 293.
Accordingly, for the reasons stated above, we affirm the trial court's denial of Weaver's motion for new trial.
Judgment affirmed.
Reese, J., concurs. Rickman, J., concurs in Divisions 2, 3 and 4 (b) and dissents as to Divisions 1 and 4 (a).
* DIVISIONS 1 AND 4(A) OF THIS OPINION ARE PHYSICAL PRECEDENT ONLY. COURT OF APPEALS RULE 33.2 (a).

The trial court merged Weaver's second degree cruelty to children convictions with the first degree cruelty to children convictions, and merged the aggravated assault convictions with the aggravated battery convictions.

Jackson v. Virginia , 443 U. S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

The x-rays were not entered into evidence at trial, but the doctor utilized a diagram to illustrate the infant's injuries to the jury.

In the indictment, the State only alleged the severe disfigurement prong of OCGA § 16-5-24.

See e.g., Williams v. State , 248 Ga. App. 316, 318 (1), 546 S.E.2d 74 (2001).

As previously noted, OCGA § 24-14-6 provides that "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused."

Strickland v. Washington , 466 U. S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).